**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED-ED4
03 APR -7 AM 9:46

CLERK
U.S. DISTRICT COURT

**JUDGE MORAN**

| | |
|---|---|
| AIRCRAFT OWNERS AND PILOTS ASSOCIATION and PHIL BOYER, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE CITY OF CHICAGO and THE CHICAGO PARK DISTRICT, | ) ) ) |
| Defendants. | ) ) ) |

Case No. 03 C 2367

MAGISTRATE JUDGE NOLAN

DOCKETED
APR 0 8 2003

**COMPLAINT**

Plaintiffs Aircraft Owners and Pilots Association ("AOPA") and Phil Boyer, by their

attorneys, Terrence P. Canade, Gary W. Westerberg and Steven T. Whitmer, complain of

defendants, The City of Chicago ("the City") and the Chicago Park District ("the Park District")

as follows:

**Nature Of Action**

1.      Defendants the City and the Park District violated a Federal Aviation

Administration ("FAA") regulation when the City destroyed the runway at Meigs Field in the

early hours of March 31, 2003 without required advance notice to the FAA. The notice

provision of the FAA regulation is designed to benefit persons such as plaintiffs AOPA and

Mr. Boyer who, as pilots, use Meigs Field for takeoffs and landings. On April 3, 2003, AOPA

submitted to the FAA a formal complaint, which remains pending. AOPA seeks declaratory

relief and injunctive relief against further illegal efforts to destroy Meigs Field, in order to

preserve AOPA's opportunities to obtain effective administrative and other relief.

**Parties**

2.      Plaintiff AOPA is a not for profit corporation, organized under the laws of the state of New Jersey, with its principal place of business in Frederick, Maryland. AOPA represents the interests of approximately 400,000 aircraft owners and pilots in the United States and brings this action in its individual capacity and on behalf of its members. AOPA members regularly and consistently use Meigs Field. But for defendants' acts, complained of herein, AOPA would reasonably expect to continue using Meigs Field for the same or similar purpose.

3.      Plaintiff Mr. Boyer is the President of AOPA and is an active pilot who has regularly and consistently used Meigs Field. But for defendants' wrongful acts, Mr. Boyer would reasonably expect to continue using Meigs Field.

4.      Defendant the City is a municipal corporation, pursuant to 65 ILCS 5/2-2-1. The City's principal place of business is Chicago, Illinois.

5.      Defendant the Park District is a special district, pursuant to 70 ILCS 1505/1 *et seq.* The Park District's principal place of business is Chicago, Illinois.

**Jurisdiction And Venue**

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, because this action arises under the laws of the United States -- specifically, 14 C.F.R. §157.

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because all defendants reside in this District and because a substantial part of the events giving rise to this claim occurred in this District.

**Background**

8.     AOPA members comprise more than two-thirds of the active civil pilots certificated in the United States and account for more than two-thirds of the flying in this country.

9.     AOPA is dedicated to the advancement of general aviation, which is all of aviation except airlines and the military.  Of particular concern to AOPA is preserving the use of civil airports throughout the country for aircraft owners and pilots.

10.     Meigs Field has operated as an airport since 1948 on an island in Lake Michigan proximate to downtown Chicago.

11.     Meigs Field has a single runway ("the Runway"), which is essential to the operation of Meigs Field as an airport.

12.     Meigs Field is an integral part of the statewide and national transportation system. Meigs Field is listed in the National Plan of Integrated Airport Systems and serves as a "reliever" airport for the Chicago area.

13.     As a reliever airport, Meigs Field provides pilots with attractive alternatives to the saturated nearby airports, O'Hare International Airport ("O'Hare) and Midway Airport ("Midway").

14.     As a reliever airport, Meigs Field provides benefits to the commercial aviation system and to O'Hare and Midway, by allowing general aviation aircraft to avoid taking up saturated operational capacity at O'Hare and Midway.

3

15.     Meigs Field is one of more than 300 airports that has been submitted to Congress under 49 U.S.C. § 47103 as being significant to the national air transportation system.

16.     The Park District owns the land on which Meigs Field has operated.  The City has long operated Meigs Field pursuant to a lease ("the Lease") with the Park District.  The City and the Park District terminated the Lease effective March 31, 2003.

## The City Destroys the Meigs Field Runway

17.     On Sunday, March 30, 2003, at approximately 11:00 p.m. and under cover of darkness, the City launched a surprise raid on Meigs Field and severely damaged and disabled the Runway.  More specifically, the City, with the apparent cooperation of the Park District, caused heavy industrial equipment, including bulldozers and backhoes, to gouge six large "Xs" into the Runway.  By the pre-dawn hours of Monday, March 31, 2003, the City and the Park District completed their task to render the Runway temporarily unusable.

18.     The City's destruction of the Runway without notice caused the aircraft of several of AOPA's members to be stranded at Meigs Field for a period of time.

## The Regulation

19.     The FAA has authority to promulgate regulations which apply to closure of airports, such as Meigs Field, pursuant to 49 U.S.C. §44502(c)(2):

> To ensure conformity, an airport or landing area not involving the expenditure of Government money may be established or constructed, or a runway may be altered substantially, only if the Administrator of the Federal Aviation Administration is given reasonable prior notice so that the Administrator may provide advice on the effects of the establishment, construction, or alteration on the use of airspace by aircraft.

20.     The FAA promulgates notice requirements concerning the construction, alteration and deactivation of an airport pursuant to Part 157 of the Code of Federal Regulations (the "Regulation").

21.     The Regulation requires a person intending to "[d]eactivate, discontinue using, or abandon an airport or any landing or takeoff area of an airport for a period of one year or more" to notify the FAA at least "90 days in advance of the day that work is to begin." 14 C.F.R. § 157.3; 14 C.F.R.§ 157.5.

22.     There are two limited exceptions to the Regulation's 90-day advance notice requirement, pursuant to 14 C.F.R. § 157.5 (b):

> (1)  [I]n an emergency involving essential public service, public health, or public safety or when the delay arising from the 90-day advance notice requirement would result in an unreasonable hardship, a proponent may provide notice to the appropriate FAA Airport District/Field Office or Regional Office by telephone or other expeditious means as soon as practicable in lieu or submitting FAA form 7480-1. However, the proponent shall provide full notice, through the submission of FAA form 7480-1, when otherwise requested or required by the FAA.

> (2)  notice concerning the deactivation, discontinued use, or abandonment of an airport, an airport landing or takeoff area, or associated taxiway may be submitted by letter. Prior notice is not required; except that *a 30 day prior notice is required when an established instrument approach procedure is involved* or when the affected property is subject to any agreement with the United States requiring that it be maintained and operated as a public-use airport. (Emphasis added).

23.     At the time of the destruction of the Runway, there were "established instrument approach procedure[s]" at Meigs Field. Therefore, the Regulation required the City to provide the FAA with at least 30-day advance notice before it acted to deactivate, discontinue or abandon the airport operations existing at Meigs Field.

24.     The Regulation's notice provisions provide a significant benefit to AOPA and to Mr. Boyer by providing them with an opportunity to revise flight plans and by ensuring their safety.  Absent notice, AOPA members might not be in position to alter established flight plans, which may create hazards and inconveniences in connection with taking off and landing aircraft.

25.     The Regulation's notice provisions trigger important FAA investigations into "the effects the proposed action would have on existing or contemplated traffic patterns of neighboring airports" and "the effects of the proposed action on the safe and efficient use of airspace by aircraft and the safety of persons and property on the ground . . . ."  14 C.F.R. § 157.7(a).

### The City Violated The Regulation's Notice Provision

26.     The City and the Park District did not provide *any* advance notice to the FAA before destroying the Runway.

27.     After destroying the Runway, the City issued a letter, which purported to notify the FAA that the City "has deactivated, discontinued using, and abandoned" Meigs Field and that the Runway was "no longer safe or suitable for aircraft operations."  (A true and correct copy of the City's March 31, 2003 letter to the FAA is attached to this Complaint as Exhibit A).

28.     Mayor Daley, on behalf of the City, openly admitted that the City and the Park District engaged in their covert late-night destruction of the Runway to circumvent any public scrutiny, resistance or debate.  (A true and correct copy of the City's official statement regarding its actions at Meigs Field is attached to this Complaint as Exhibit B).

29.     The City asserts that it closed Meigs Field "to protect the millions of people who live, work, and visit our downtown Chicago in these very uncertain times." (Exhibit B).

### No Emergency Required Destruction Of The Runway Without Notice

30.     In March, 2003, the FAA and the United States Department of Homeland Security approved the City's request for a Temporary Flight Restriction ("TFR") over the greater downtown Chicago area.

31.     The TFR restricted aircraft from traversing, without prior authorization, the airspace over the greater downtown area.

32.     With the TFR in place, no genuine and immediate threat required the City to close Meigs Field as part of "emergency" measures.

33.     The City closed down Meigs Field without coordinating or consulting with the Transportation Security Administration ("TSA"), which is the agency that is responsible for national emergency measures concerning transportation security. 49 U.S.C. §114(g).

34.     Aircraft utilizing Meigs Field pose no threat to the greater Chicagoland area, and certainly no greater threat than aircraft in transit to and from O'Hare and Midway, which aircraft often use the air space surrounding Meigs Field.

### The Defendants Have Caused Irreparable Harm

35.     AOPA and Mr. Boyer have suffered irreparable harm from the destruction of the Runway at Meigs Field and will continue to suffer irreparable harm, if the City and the Park District further destroy Meigs Field pending efforts to obtain appropriate relief.

36.     The illegal actions of the City and the Park District prevent AOPA, Mr. Boyer and others from their regular and consistent use of Meigs Field, which is used just like a part of an international highway system.

37.     The illegal actions of the City and the Park District irreparably undermine the important function that Meigs Field serves as a reliever airport to provide options to aircraft and to relieve O'Hare and Midway of demands upon operations capacity.

38.     Legal remedies, such as money damages, are incalculable, are potentially unavailable, and cannot adequately compensate AOPA and Mr. Boyer for the irreparable harm that they have suffered and will continue to suffer.

### AOPA Files FAA Complaint

39.     Prior to filing this action, AOPA submitted to the FAA a complaint, pursuant to 14 C.F.R. §13.5, which provides persons, such as AOPA, with a non-exclusive avenue for relief through the FAA for certain wrongful acts of other persons, such as the City. (A true and correct copy of AOPA's April 3, 2003 complaint to the FAA, as supplemented with an April 4, 2003 submission, is attached to this Complaint as Exhibit C).

40.     AOPA's FAA complaint, like this action, requests that the FAA find that the City and the Park District violated the Regulation and asks the FAA to use its powers to remedy the violations.

41.     AOPA and Mr. Boyer are reasonably concerned, in light of the recent covert behavior of the City and the Park District, that the City and the Park District might further

irreparably harm Meigs Field, before the FAA completes its analysis and fashions any remedy for the violations of the Regulation.

### The Currently Pending State Action

42.    AOPA and Mr. Boyer are aware of an action pending in the Circuit Court of Cook County, Illinois, captioned *Illinois Association of Air and Critical Care Transport, et al. v. Mayor Richard M. Daley, et al.*, Case Number 03 CH 06172 (the "State Action"), which arises out of the City's wrongful closure of Meigs Field.

43.    The State Action seeks declaratory and injunctive relief for state law claims under the Illinois Open Meetings Act, *quo warranto* and the public trust doctrine.

44.    The court in the State Action conducted a hearing on Friday, April 4, 2003 in connection with the plaintiffs' request for a temporary restraining order ("TRO") to enjoin the City, its mayor and the Park District from further damaging Meigs Field, including but not limited to the Runway, taxiway, control towers, terminals and any other facility connected therewith.

45.    The court in the State Action analyzed the pleadings and affidavits on file, entertained argument by counsel for all parties, and entered a TRO prohibiting the defendants from further destroying Meigs Field pending a May 16, 2003 evidentiary hearing in support of a request for a preliminary injunction.

46.    Defendants in the State Action plan to move to dismiss that action in the coming days.

47.     AOPA and Mr. Boyer do not plan to burden this Court with a request for emergency relief, unless the State Action TRO becomes ineffective before either the FAA or this Court completes its analysis of the violation of the Regulation.

### This Action Is Distinct From 1996 Action

48.     In 1996, the City and the Park District sought to close Meigs Field.

49.     In 1996, AOPA sued the City and the Park District in this Court to enjoin efforts to close Meigs Field, Cause No. 96 C 5793 (denial of preliminary injunction affirmed on appeal).

50.     AOPA disposed of its 1996 claims with prejudice, based upon the City's and the Park District's pledge to maintain Meigs Field as an operating airport under certain conditions.

51.     This action is not a re-filing of the 1996 action and does not seek to re-assert or otherwise revisit any claims from that action.

WHEREFORE, plaintiffs AOPA and Mr. Boyer pray that this Court enter judgment in their favor and against defendants the City and the Park District as follows:

1.     Declare, pursuant to 28 U.S.C. § 2201, that the City and the Park District violated the Regulation;

2.     Preliminarily and permanently enjoin, to the extent that the State Action TRO becomes ineffective, the City and the Park District from further destruction of Meigs Field as an airport; and

3.      For further relief as this Court deems appropriate.


Dated:   April 7, 2003

AIRCRAFT OWNERS AND PILOTS
ASSOCIATION and PHIL BOYER


By: _____

One of Their Attorneys


Terrence P. Canade  (06196823)
Gary W. Westerberg  (02990369)
Steven T. Whitmer (06244114)
LORD, BISSELL & BROOK
115 South La Salle Street
Chicago, Illinois 60603
Tel.: (312) 443-1862 (T. Canade)
Fax: (312) 896-6562  (T. Canade)

*Of Counsel*
John S. Yodice
Ronald D. Golden
YODICE ASSOCIATES
601 Pennsylvania Ave NW, Suite 875
Washington, DC 20004
Tel.: (202) 737-3030


712950_4

# EXHIBIT A



City of Chicago
Richard M. Daley, Mayor

Department of Law

Mara S. Georges
Corporation Counsel

Commercial and Policy Litigation
Suite 900
30 North LaSalle Street
Chicago, Illinois 60602-2580
(312) 744-0018
(312) 744-6912 (FAX)
(312) 744-5104 (TTY)

http://www.cityofchicago.org

March 31, 2003

By Facsimile Transmission 847/294-7046
and U.S. Postal Service Delivery

Mr. Philip M. Smithmeyer
Manager, Chicago Airports District Office
Federal Aviation Administration
2300 East Devon Avenue
Des Plaines, IL 60018

Re:  Permanent Closure of Merrill C. Meigs Field (CGX)

Dear Mr. Smithmeyer:

Pursuant to 14 Code Of Federal Regulations § 157.5(b)(1) and (2), this letter serves as notice that the City of Chicago has deactivated, discontinued using and abandoned Merrill C. Meigs Field ("CGX") in Chicago, Illinois. Airport operations at CGX have permanently ceased. As provided in 14 CFR § 157.5(b), this notice is provided by this letter in lieu of submitting FAA Form 7480-1. A Notice to Airmen ("NOTAM": advising that CGX is closed was issued at 3:02 a.m. on March 31, 2003. The City of Chicago further advises the FAA that demolition of runway, taxiway and other structures at CGX has begun and is continuing, and that the facilities at CGX are no longer safe or suitable for aircraft operations.

FAA regulations permit this action without prior notice to the FAA "in an emergency involving essential public service, public health, or public safety" or when the delay arising from prior notice "would result in an unreasonable hardship." 14 CFR §157.5(b). Because immediate closure of CGX involves public safety, and any delay in closing CGX would result in an unreasonable hardship, prior notice is not required.

Public Safety. The people of Chicago, and particularly the people in and near downtown Chicago are exposed to the danger of a terrorist act involving use of an airplane. Temporary Flight Restrictions ("TFR") were imposed over downtown Chicago in response to that threat. However, the TFRs do not completely address the danger posed by small





Mr. Philip M. Smithmeyer
Manager, Chicago Airports District Office
Federal Aviation Administration
March 31, 2003
Page 2

aircraft at low altitudes outside the zone covered by the TFR. Operation of CGX necessarily involves such aircraft. The constant presence of small aircraft in close proximity to the downtown area is a threat to the safety of hundreds of thousands of people in that area. In the current heightened level of awareness and concern, these aircraft pose an immediate threat to public safety.

Unreasonable Hardship. As of April 1, 2003, the City of Chicago has no legal authority to operate an airport on Chicago Park District ("Park District") property. CGX operated on land leased from the Park District, a unit of local government separate and distinct from the City of Chicago. The Park District, by letter dated March 29, 2003, terminated the lease effective April 1, 2003. As a result, the City of Chicago no longer has the legal authority to operate an airport on the Park District's property. The Park District does not have the resources, powers or governmental purpose for operation of a public airport. Delay in closing CGX is not reasonably possible, and doing so would impose an unreasonable and insurmountable hardship.

The termination of the lease for the property at CGX occurred after consultation between the Park District and the City of Chicago. The Park District shares the City's assessments with respect to public safety.

FAA determinations under 14 CFR Part 157 are "only advisory." 14 CFR § 157.7(a). We have taken every available measure, including oral notice to the FAA and a NOTAM, to ensure the safe deactivation and discontinuance of use of CGX. We trust that the FAA will understand the circumstances involved in this action.

With the consent of the Park District, the City of Chicago intends to maintain the CGX air traffic control tower until May 1, 2003, or such earlier time as the FAA advises the City that the tower is no longer needed for air traffic control or safety purposes. The City intends that throughout this period the tower will be staffed in accordance with the schedule in effect prior to the closure of CGX and maintain normal communications with aircraft.

Mr. Philip M. Smithmeyer
Manager, Chicago Airports District Office
Federal Aviation Administration
March 31, 2003
Page 3


Please address any questions about this action to John Harris, Deputy Commissioner of the Department of Aviation or me.


Sincerely,

Michael A. Forti
Deputy Corporation Counsel


cc: David Doig, Chicago Park District

# EXHIBIT B

**Daley defends decision to close Meigs**
Statement made from City Hall

As most of you know by now, we have closed Meigs field. We have done this to protect the millions of people who live, work, and visit our downtown Chicago in these very uncertain times. Nine days ago, as you know, we announced that the FAA and the Homeland Security Department had approved our requests for a temporary flight restriction over the greater downtown area. We are grateful to those agencies for approving the restriction, but it's simply not enough to insure an appropriate level of safety and security to the people of Chicago.

First of all, a temporary flight restriction is just that-temporary. It could be lifted at any time without the approval of the mayor, the city council, the people of Chicago.

More important, it does not address the problem that occurs every day as the aircraft approaches Meigs Field within a few hundred yards and only a few seconds flight time of our tallest buildings. And not just our tallest buildings, but hundreds of thousands of people not only at the Taste of Chicago and the Grant Park concerts, the Museum Park, Navy Pier, Water Filtration Plant, will be using the beaches and visiting our museums.

Those airplanes appear to be going to Meigs, but within sudden turn, they could cause a terrible tragedy downtown on our crowded parks. That scares me. It scares people who live, who work, and visit our downtown. And who use our parks and work every day here in the city of Chicago. They should not have to wonder whether the airplane that appears to be headed for Meigs might have other intentions.

There is very little the city can do to reduce the risk of an attack by an aircraft. We have no control over airplanes in the air. We had to fight for months just to get the temporary flight restriction, months and years as well. But we can control whether we have a city airport that's a few seconds away from the heaviest concentration of people in buildings in North America.

A close at Meigs reduces the risk and perception of risk at Meigs. It makes Chicago a safer city and makes us feel like a safer city.

Why did we act so quickly? Because the fears exist right now. To do this any other way would have been needlessly contentious and jeopardize public safety, prolonged anxiety among Chicagoans for months and year.

The groups that want to keep Meigs open are certain to be unhappy with the decision. I understand the concern, but public safety must come first and foremost here in the city of Chicago. The private aircraft that have been using Meigs will find plenty of space at other regional airports and there are. Yes, it will be less convenient for them, but the safety of the entire city had to take precedent over the wishes of a relative handful of private pilots and businesspeople.

As for 16 small planes currently parked at Meigs, we're awaiting word from FAA as to whether it will allow them to take off on the runway. Regardless of the FAA decision, I want to assure the owners of the aircraft the city will reimburse them for the expenses of removing the planes from Meigs.

Some of you may be wondering how the city can afford to close Meigs. In fact, Meigs has been subsidized to the tune of $3 to $4 million by the airlines and customers using O'Hare International Airport. Closing Meigs will provide welcome financial relief to our cash-strapped airlines.

Finally, to anticipate what I know will be a question, yes, I do want a park at Meigs Field. Yes, I am fully aware that many of you will likely question for months to come the motive for closing the airport. The reason we closed the airport now is a fear shared by the Park District, emergency management specialists, and myself about all those airplanes coming so close to so many people in the downtown area.

While there have been no specific threat, let me repeat -- there has been no specific threats-- as mayor of the city of Chicago, public safety is one of the primary responsibilities. I take it very seriously. I am not willing to wait for a tragedy as some have asked me to do, to happen before making a very difficult and tough decision.

Thank you very much.

# EXHIBIT C

**AIRCRAFT OWNERS AND PILOTS ASSOCIATION**

**AOPA**

421 Aviation Way • Frederick, MD 21701-4798
Telephone (301) 695-2000 • FAX (301) 695-2375
www.aopa.org

April 3, 2003

The Honorable Marion C. Blakey
Administrator, Federal Aviation Administration
c/o Office of the Chief Counsel
Attention: Enforcement Docket (AGC–10)
800 Independence Ave., S.W.
Washington, DC 20591

Dear Madame Blakey:

Pursuant to 14 C.F.R. Section 13.5, the Aircraft Owners and Pilots Association (AOPA) hereby files a formal complaint with respect to actions taken by the City of Chicago and the Mayor of the City of Chicago to alter and deactivate the public use and reliever airport of Merrill C. Meigs Field. AOPA alleges that the City of Chicago has violated provisions of 14 C.F.R. Part 157 and 49 U.S.C. Section 44502(c)(2). As such, AOPA request that the FAA seek all appropriate remedies, including that the FAA issue a cease and desist order to prevent any further destruction or alteration of the airport followed by a request to the United States Attorney General to bring an action in the United States District Court for such relief as necessary or appropriate, see 14 C.F.R. §§ 13.20 and 13.25, and that the FAA take immediate and appropriate enforcement action seeking sanctions, see 14 C.F.R. §§ 13.16 and 13.16. These are matters that are within the jurisdiction of the Administrator of the FAA.

In accordance with the procedures required by Section 13.5, AOPA submits the following:

Person who is the subject of this complaint:
    The City of Chicago and its Mayor Richard M. Daley
    121 N. LaSalle, Room 507
    Chicago, IL 60602
    312-744-8045

Specific provisions violated:
    14 C.F.R. Sections 157.3(b), 157.3(c), 157.3(e), 157.5(a)
    49 C.F.R. Section 44502(c)(2)

The Honorable Marion C. Blakey
April 3, 2003
Page 2

Concise statement of facts:

In the very early morning hours of March 31, 2003, the City of Chicago caused
demolition equipment and crews to dig "X"'s in the asphalt of the single and sole runway
at Meigs Field, thereby rendering the runway and the airport unusable as an airport. The
City took this unprecedented action without prior notice to the Federal Aviation
Administration, without prior notice to the users of the airport, without prior notice to the
tenants of the airport, without prior notice to the aircraft parked at the airport at the time
of the destruction, and without prior notice to citizens of Chicago. The City's actions
were meant to be immediate and final. See enclosed "Statement from City Hall."

In order for the Secretary of Transportation to fulfill his statutory obligations to ensure
conformity with plans and policies for, and allocation of, airspace by the Administrator of
the FAA, the law requires that "an airport or landing area not involving the expenditure
of Government money may be established or constructed, or a runway may be altered
substantially, *only if* the Administrator of the Federal Aviation Administration is given
reasonable prior notice so that the Administrator may provide advice on the effects of the
establishment, construction, or alteration of airspace by aircraft." 49 U.S.C § 44502(c)(2)
(emphasis added). In order to carry out this obligation, the FAA promulgated Part 157 of
the Federal Aviation Regulations. FAR Part 157 provides, in part, that each person who
intends to alter a runway, deactivate an airport or runway, or change the status of an
airport, shall submit a notice of such intent to an FAA Airport District/Field Office or
Regional Office, on an FAA Form 7480-1, prior to taking the intended action.

On information and belief, the City of Chicago failed to notify the FAA of his intent to
cause extensive damage to the only existing runway at Meigs Field and his intent to
finally deactivate the airport. The notice was required to be made and sent to an FAA
Airport District/Field Office or an FAA Regional Office, both of which exist in Des
Plaines, Illinois, an adjacent suburb of the City of Chicago. As a consequence, the FAA
was denied its opportunity to conduct an aeronautical study and to issue a determination,
after consultation with interested parties, as appropriate, that the FAA advises that it has
no objection, that it has conditional objections, or that it objects. As a further
consequence, the FAA's management of the airspace and the aircraft in the vicinity of the
City of Chicago has been affected and without the FAA's ability to act to either respond
to or mitigate the adverse safety effects of the City's destruction. The FAA was unable to
issue a Notice to Airman who could have been inbound to the airport that there were
crews on the runway destroying it, and the FAA was unable to plan for the management
of aircraft and airspace changes to accommodate the now-redirected traffic. Such
actions by the City of Chicago constitute violations of Sections 157.3 and 157.5 of the
Federal Aviation Regulations.

The Honorable Marion C. Blakey
April 3, 2003
Page 3


AOPA requests that the FAA take all appropriate action. AOPA specifically requests that the FAA issue an order to the City of Chicago to cease and desist any further alterations at the airport and that the FAA request the Attorney General to initiate a lawsuit for similar injunctive relief. In addition, AOPA requests that the FAA initiate legal enforcement action against the City of Chicago for violations of the FAR and the statute.

Person filing the complaint:
Aircraft Owners and Pilots Association
421 Aviation Way
Frederick, MD 21701
301-695-2000


AOPA is a nationwide, non-profit, membership association of almost 400,000 aircraft owners and pilots who comprise more than two-thirds of all the active civil pilots certificated in the United States, and who account for more than two-thirds of the flying in this Country. AOPA is dedicated to the advancement of that segment of aviation known as general aviation. Of particular concern to the advancement of general aviation is the closure of civil airports throughout the Country. This circumstance presents a case of such a loss. AOPA has been very active on the national, state, and local levels in examining issues related to general aviation, in general, and to pilots' access to airports, in particular. As a spokesperson for general aviation interests in the United States, AOPA has frequently participated in proceedings seeking to protect rules, processes, and policies that are in place to protect against the loss or limitation of the use of public airports.

Sincerely,

Phil Boyer
President

Enclosure
cc: Mayor Richard M. Daley

**AIRCRAFT OWNERS AND PILOTS ASSOCIATION**

421 Aviation Way • Frederick, MD 21701-4798
Telephone (301) 695-2000 • FAX (301) 695-2375
www.aopa.org

April 4, 2003

The Honorable Marion C. Blakey
Administrator, Federal Aviation Administration
c/o Office of the Chief Counsel
Attention: Enforcement Docket (AGC-10)
800 Independence Ave., S.W.
Washington, DC 20591

Dear Madame Blakey:

This is to supplement the formal complaint that the Aircraft Owners and Pilots
Association (AOPA) made pursuant to 14 C.F.R. Section 13.5, on April 3, 2003. At the
time that the complaint was sent, AOPA was not aware of a letter that was sent by the
City of Chicago. AOPA reaffirms its filing of the formal complaint with respect to
actions taken by the City of Chicago and the Mayor of the City of Chicago to alter and
deactivate the public use and reliever airport of Merrill C. Meigs Field. A copy of
AOPA's formal complaint is enclosed. With this letter, AOPA supplements its
allegations that the City of Chicago has violated provisions of 14 C.F.R. Part 157 and 49
U.S.C. Section 44502(c)(2) to address newly learned information.

In particular, it appears that a letter was sent to the FAA's Chicago Airport District Office
sometime during business hours on March 31, 2003. A copy of that letter is enclosed. In
that letter, the City of Chicago claims that prior notice of its action to deactivate,
discontinue using, and abandon Meigs Field was not required to be given to the FAA
because the City's action was permitted "in an emergency involving essential public
service, public health, or public safety." The City of Chicago claims that the "immediate
closure of [Meigs Field] involves public safety, and any delay in closing [Meigs Field]
would result in an unreasonable hardship." The exception to the prior notice of intent
that is required by Part 157 of the Federal Aviation Regulations does not apply to the
City's actions in this case. There is no public safety concern or unreasonable hardship
that could justify the City's decision to destroy the use of the property as an airport and to
wait until after the destruction of that property was accomplished to notify the FAA.

As the City acknowledges, a temporary flight restriction (TFR) was put in place over the
City of Chicago, much like TFRs have been put in place in other areas of the country by
the FAA and Department of Homeland Security and for the reason of public safety
concerns generated by national security interests. The TFR over the City was a
restriction requested by the City of Chicago. In fact, in a March 20, 2003, letter sent by
Senator Richard J. Durbin to the Department of Homeland Security, the Senator
supported the City of Chicago's request that a downtown temporary flight restriction be
reimposed over the City. A copy of that letter and the City's letters are enclosed. There
was no mention that the City also wanted to close Meigs Field because of any

Administrator Blakey
Federal Aviation Administration
April 4, 2003
Page 2

"immediate threat" that "the constant presence of small aircraft in close proximity to the downtown area" poses, which is what the City is claiming less than two weeks later. In defending the City's actions, the Mayor of the City of Chicago has stated that they are not aware of any specific threat. This local action to affect air navigation and airspace interferes with the federal government's role in ensuring national security and making aviation safety determinations and does not satisfy the exception to the notice requirement in Part 157. Any further restriction of aviation transportation than was already achieved by the federal governmental agencies empowered with the very responsibility for transportation security was not warranted, belying any claim of "emergency".

Furthermore, if the lease of the airport property had been terminated by the Chicago Park District, the City's legal authority to operate on the property may have been terminated, but it could not have legitimized the City's exercise of authority to demolish the runway. There are many, more appropriate, well-established ways to deactivate an airport, including marking "x"'s on the runway, positioning vehicles on the runway, asking the FAA to issue a NOTAM that the airport was closed, and having the air traffic control tower advise aircraft calling in, which could have accomplished any objective to keep aircraft from using the airport while the FAA could study the proposal and render a determination, advisory or otherwise.

In sum, the City's actions violated the FAA's regulations and the statute and deprived the government of its ability to fulfill statutory obligations. The City was required by federal law to give 30-days prior notice of its intent to deactivate, discontinue using, or abandon the runway and the airport of Meigs Field when an established instrument approach procedure was involved so that the FAA could study and respond to the impact of such action.

As such, AOPA reaffirms its allegations that violations of the law have been committed by the City of Chicago that are matters within the FAA's jurisdiction and reaffirms its request that the FAA seek all appropriate remedies.

Sincerely,

Phil Boyer

Enclosures

cc:  Mayor Richard M. Daley

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

AIRCRAFT OWNERS AND PILOTS
ASSOCIATION AND PHIL BOYER

## DEFENDANTS

THE CITY OF CHICAGO and
THE CHICAGO PARK DISTRICT

DOCKETED
APR 0 8 2003

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___Cook___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___Cook___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Terrence P. Canade 312/443-1862
LORD, BISSELL & BROOK
115 South LaSalle Street
Chicago, Illinois 60603

ATTORNEYS (IF KNOWN)

JUDGE MORAN

03C 2367

MAGISTRATE JUDGE NOLAN

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

14 C.F.R. § 157 - action for declaratory judgment and injunctive relief against the City of Chicago and Chicago Park District for violating the notice provisions of Part 157 of the Code of Federal Regulations.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. REMARKS
General Rule 2.21D(2)
In response to ☒ is not a refiling of a previously dismissed action
this case ☐ is a refiling of case number _____ of Judge _____

DATE
4/7/03

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

In the Matter of



AIRCRAFT OWNERS AND PILOTS ASSOCIATION
and PHIL BOYER, Plaintiffs, v.
THE CITY OF CHICAGO and THE CHICAGO
PARK DISTRICT, Defendants.

Case Number: **03 C 2367**

MAGISTRATE JUDGE NOLAN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

## AIRCRAFT OWNERS AND PILOTS ASSOCIATION and PHIL BOYER, Plaintiffs

DOCKETED

APR 0 8 2003

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Terrence P. Canade | NAME Gary W. Westerberg |
| FIRM Lord, Bissell & Brook | FIRM Lord, Bissell & Brook |
| STREET ADDRESS 115 South LaSalle Street | STREET ADDRESS 115 South LaSalle Street |
| CITY/STATE/ZIP Chicago, Illinois 60603 | CITY/STATE/ZIP Chicago, Illinois 60603 |
| TELEPHONE NUMBER (312) 443-1862 | TELEPHONE NUMBER (312) 443-0245 |
| IDENTIFICATION NUMBER 06196823 | IDENTIFICATION NUMBER 02990369 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES ✔ NO |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES ✔ NO |
| | DESIGNATED AS LOCAL COUNSEL? YES NO ✔ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Steven T. Whitmer | NAME |
| FIRM Lord, Bissell & Brook | FIRM |
| STREET ADDRESS 115 South LaSalle Street | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, Illinois 60603 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 443-1869 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER 06244114 | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES NO ✔ | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO ✔ | DESIGNATED AS LOCAL COUNSEL? YES NO |

U.S. DISTRICT COURT 03 APR -7 AM 9: 6 FILED-E04